IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

ROBERT COVINGTON,                          )
                    Plaintiff,             )
                                           )
          v.                               )          CIVIL NO. 3:12-cv-209-JRS
                                           )
MICHAEL J. ASTRUE,                         )
          Commissioner of Social Security, )
          Defendant.                       )
_____)

## REPORT AND RECOMMENDATION

Robert Covington ("Plaintiff") is 50 years old and worked at United Airlines loading and

unloading the aircraft, pushing the aircraft from the gate and de-icing the aircraft before he

injured his back. On March 25, 2008, Plaintiff protectively applied for Social Security Disability

("DIB") under the Social Security Act (the "Act") with an alleged onset date of May 11, 2005,

claiming disability due to a ruptured disc, a cyst, arthritis, a heart condition, depression, high

blood pressure and back problems. Plaintiff's claim was presented to an administrative law

judge ("ALJ"), who denied Plaintiff's requests for DIB. The Appeals Council subsequently

denied Plaintiff's request for review on January 17, 2012.

At Plaintiff's hearing before the ALJ, a vocational expert ("VE") did not testify. (*See* R.

at 33-69.) Without the aid of the VE, the ALJ determined that there were positions in the

economy which Plaintiff could perform, despite his findings that Plaintiff was severely impaired

with depression and that Plaintiff contained a residual functional capacity ("RFC") to perform

sedentary work, but limited him to simple, unskilled jobs. (*See* R. at 14-16.) Plaintiff now

challenges the ALJ's denial of benefits, asserting that he did not properly evaluate his claim

when the ALJ failed to obtain a VE. (Pl.'s Mem. of Points and Author. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 7-9.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment, which are now ripe for review.[1] Having reviewed the parties' submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, it is the Court's recommendation that Defendant's motion for summary judgment (ECF No. 11) be DENIED; that Plaintiff's motion for summary judgment (ECF No. 8) be GRANTED and that the final decision of the Commissioner be VACATED and REMANDED to the ALJ for the sole purpose of obtaining VE testimony.

## I. BACKGROUND

Because the ALJ determined that Plaintiff was severely impaired with depression, Plaintiff claims that the ALJ erred when he failed to obtain a VE to testify to whether Plaintiff could still work, despite his non-exertional limitations. As Plaintiff's argument revolves around his mental capacity, Plaintiff's education and work history, Plaintiff's mental medical history, the opinion of a consultative psychologist, the opinions of the non-treating state agency psychologists, Plaintiff's reported activities of daily living (ADLs) and the hearing testimony are summarized below.

### A.    Plaintiff's Education and Work History

---

[1] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

Plaintiff completed the 11th grade in high school, but did not obtain a GED. (R. at 36-37, 549.) He worked for Millionaire Airlines fueling aircraft. (R. at 44.) He last worked for United Airlines loading and unloading the aircraft, pushing the aircraft from the gate and de-icing the aircraft. (R. at 43.) He stopped working at United after he injured his back on the job. (*See* R. at 203.) His workers' compensation ended in January 2010. (R. at 41.)

Despite working with a professional vocational rehabilitation counselor and applying for positions, Plaintiff had been unsuccessful with obtaining full-time work. (R. at 41.) A handful of times, Plaintiff trapped and removed nuisance animals for the Virginia Department of Game and Fisheries for a small fee. (R. at 38-40.) He also volunteered with a state agency issuing permits to harvest deer about once a month. (R. at 42-43.)

**B.      Plaintiff's Medical Records**

On December 17, 2007, Plaintiff reported that he had anxiety, panic, insomnia, as well as a low mood, and was prescribed an antidepressant. (R. at 356-57.) Although he took antidepressants, he did not attend counseling. (*See* R. at 56.) At different times, patient notes included documentation that Plaintiff indicated he had a depressed mood, mood swings and forgetfulness (R. at 339), a normal mood and affect (R. at 448, 452, 454, 534), or an agitated, apathetic and depressed mood and affect (*see* R. at 475, 479). In July 2008, Plaintiff was verbally abusive to staff at his physician's office when he was denied an early renewal of pain medication. (R. at 368.)

**C.      The Opinion of Robert Buncher, Ph.D., Plaintiff's Consultative Psychologist**

On November 11, 2008, Plaintiff visited Robert Buncher, Ph.D., for a consultative examination. (R. at 456-61.) Plaintiff stated that he became depressed after he injured his back

3

and became unable to work in 2005. (R. at 456.) He dropped out of school in the 12th grade, because he was failing a course and wanted to help his mother. (R. at 456.)

Plaintiff worked for United Airlines for 22 years until he hurt his back. (R. at 456-57.) He exhibited anger toward United for "not taking care of him correctly" after his accident. (R. at 457.) Plaintiff attempted to work twice since 2005, but quit both times because he was in too much pain. (R. at 457.) Additionally, he declined a job, because it was 45 minutes from his home and he could not drive that far. (R. at 457.)

Plaintiff had partial custody of his three-year old grandson. (R. at 457.) He lost touch with friends after he was injured, as he left the house less. (R. at 457.) Plaintiff had a sad and tearful affect, decreased energy and suicidal ideation without attempt. (R. at 457.) He obtained help from family and friends for chores in and outside the house. (R. at 457.) Plaintiff's pain contributed to his depression and loss of ability. (R. at 457-58.)

Plaintiff did not receive treatment for his depressed mood and indicated that his medications resulted in decreased attention and focus. (R. at 458.) Dr. Buncher noted that Plaintiff was neatly dressed. (R. at 458.) Plaintiff was sad, tearful and angry at times. (R. at 458.) During the interview, he occasionally had to shift in his seat or stand due to pain and discomfort. (R. at 458.) Plaintiff had poor attention, concentration and delayed recall. (R. at 458.) He was distracted easily. (R. at 459.) Plaintiff blamed his lack of focus on his medication. (R. at 458.)

Dr. Buncher diagnosed Plaintiff with dysthymia[2] and assigned him a Global Assessment of Functioning ("GAF")[3] of 65[4]. (R. at 459.) He determined that Plaintiff was credible. (R. at

---

[2] Dysthymia is a disorder "characterized by symptoms of mild depression." *Dorland's Illustrated Medical Dictionary* 582 (32d ed. 2012).

460.) Dr. Buncher opined that Plaintiff's strongest impairment was from physical problems and that "his barriers to working [were] not related to depression." (R. at 459.) Continuing, he believed that Plaintiff would continue symptoms of depression as long as he was impaired by pain and the use of pain medication. (R. at 460.)

Plaintiff's attendance would be impaired from his physical abilities and sad mood. (R. at 460.) Plaintiff's loss of attention, concentration and focus, which resulted from his medication, affected his ability to perform work activities consistently. (R. at 460.) However, he was "not impaired from completing a normal workweek due to depressed mood," but rather from physical barriers. (R. at 460.) Plaintiff would likely accept instructions from a supervisor and could likely interact with co-workers and the general public. (R. at 460.) Finally, Dr. Buncher opined that, because of Plaintiff's use of prescription pain medication, which impaired his attention and ability to focus, Plaintiff had "a very guarded prognosis for dealing with the usual stressors in competitive work." (R. at 460-61.)

## D.    Non-treating State Agency Psychologists' Opinion

On December 6, 2008, Stephen Saxby, Ph.D., a non-treating state agency psychologist, diagnosed Plaintiff with an affective disorder and opined that Plaintiff had the capacity to perform non-stressful work activities. (R. at 76-77, 82-85.) Dr. Saxby also determined that Plaintiff was moderately limited in his ability to understand and remember detailed instructions, because of his occasional depression; to carry out detailed instructions and maintain attention as

---

[3] The Global Assessment of Functioning ("GAF") is a 100-point scale that rates "psychological, social, and occupational functioning." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc., 32 (4th Ed. 2002) (hereinafter *"DSM-IV"*).

[4] A GAF of 61-70 is defined as "[s]ome mild symptoms (*e.g.,* depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (*e.g.,* occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 34.

well as concentration for extended periods; to perform activities within a schedule and complete a normal workday without interruptions; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers without distracting them; to respond appropriately to changes in the work setting; and to set realistic goals or make plans. (R. at 82-84.) Additionally, Plaintiff's depression caused him to occasionally lapse in concentration, which would make it difficult to adjust to new work-like activities. (R. at 84-85.)     Alan Entin, Ph.D., a non-treating state agency psychologist, agreed with Dr. Saxby's assessment on June 5, 2009. (R. at 98-99, 102-05.)

### E.     Plaintiff's Statements

On May 8, 2009, Plaintiff completed a Pain Questionnaire, writing that he was in constant pain. (R. at 220-21.) He further indicated that the side effects of his pain medication included insomnia, depression, headaches and increased memory loss. (R. at 221.)

In a Function Report completed on that same day, Plaintiff explained that he would wake up, let out his dog, eat breakfast, watch television in bed, occasionally nap and walk a few times a day around his house. (R. at 222-29.) Plaintiff indicated that friends and family helped him bathe his dog, perform light chores and shop for groceries. (R. at 223-26.) He also needed help keeping his medications in order. (R. at 224.) Additionally, Plaintiff asked for help when handling his money, as his memory deteriorated as a result of his medications. (R. at 225.) He would visit with people occasionally. (R. at 226.) Plaintiff marked that his ability to understand, follow instructions and complete tasks, as well as his memory and concentration, were affected by his maladies and that his ability to pay attention depended on his pain and fatigue. (R. at 227.) He indicated that he had depression and could not handle stress well. (R. at 228.)

On April 16, 2010, Plaintiff appeared before the ALJ and testified that he drove approximately four times a week to the store. (R. at 37-38.) Plaintiff stated that he attempted to work for three weeks during November 2005 and for three to four weeks in February 2006. (R. at 38.)

Plaintiff discussed the "[m]inimally invasive procedures" that had been performed on his back, mainly injections in the spinal nerve roots. (R. at 45.) He indicated that these injections did not help with his chronic pain. (R. at 45.) As a result, Plaintiff took prescription pain medication daily, although it only reduced his pain to a four or five rating out of 10. (R. at 45-46.) Plaintiff also wore an electrical stimulator every day to help ease his pain. (R. at 48.)

Plaintiff testified that he slept for three and a half hours at a time at night and stayed in bed most of the day. (R. at 49-50.) He shopped, but sometimes with help, microwaved his own food, cleaned his house with help from his mother and maintained a garden and his yard with the help of his friend and his son. (R. at 50.) Occasionally Plaintiff would pull weeds from his garden. (R. at 51.) From his bed, he built a pistol. (R. at 51.) Plaintiff could take care of his personal needs without help and occasionally socialized with friends and family. (R. at 52.)

Plaintiff was prescribed Morphine, Hydrocodone, Tramadol, Robaxin and Atenolol. (R. at 62.) He discussed the side effects of his medications, which included narcolepsy, memory loss, an inability to concentrate and fatigue. (R. at 52, 63.) Plaintiff took an antidepressant every day since the beginning of 2009. (R. at 54-55.) However, he did not attend therapy on a regular basis. (R. at 56.)

## II. PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on March 25, 2008, claiming disability due to a ruptured disc, a cyst, arthritis, a heart condition, depression, high blood pressure and back

problems with an alleged onset date of May 11, 2005. (R. at 198, 203.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[5] (R. at 112-14, 118-20.) On April 16, 2010, Plaintiff had a hearing before an ALJ. (R. at 33-69.) On June 14, 2010, the ALJ issued a decision finding that Plaintiff was not under a disability, as defined by the Act. (R. at 11-21.) The Appeals Council subsequently denied Plaintiff's request to review the ALJ's decision on January 17, 2012, making the ALJ's decision the final decision of the Commissioner and subject to judicial review by this Court. (*See* R. at 1-3.)

## III. QUESTION PRESENTED

Did the Commissioner err when he determined without the testimony of a VE that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. Jan. 5, 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.* (citations omitted); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

---

[5] Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. pt. 404, subpt. Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation omitted) (internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity"

("SGA").[6] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] his physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to his past relevant work[7] based on an assessment of the claimant's residual functional capacity ("RFC")[8] and the "physical and mental demands of

---

[6] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[7] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[8] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work *schedule."*

work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from performing his past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

---

SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

## V. ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since May 11, 2005. (R. at 13.) At step two, the ALJ determined that Plaintiff was severely impaired from degenerative disc disease of the lumbar spine, hypertension, obesity and depression. (R. at 14.) At step three, the ALJ concluded that Plaintiff's maladies did not meet one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (R. at 14-15.) More specifically, the ALJ determined that Plaintiff had mild restrictions with his ADLs, mild difficulties in social functioning and moderate difficulties with concentration, persistence or pace. (R. at 15.) Further, Plaintiff's memory suffered from the effects of his medication. (R. at 15.)

The ALJ then determined that Plaintiff had the RFC to perform sedentary work, except that he must be able to change positions briefly once an hour, should have no exposure to concentrated hazards and, due to his mental impairments, was limited to simple, unskilled jobs. (R. at 15-16.) The ALJ summarized Plaintiff's statements, which included his ability to drive, his constant pain and his work issuing permits for harvesting deer and trapping nuisance animals. (R. at 16.) Plaintiff testified that he slept for less than four hours a night, had help performing chores and took antidepressants. (R. at 16-17.)

The ALJ then summarized Plaintiff's medical records pertaining to his musculoskeletal impairments. (R. at 17-19.) The ALJ also summarized treatment notes, which indicated that Plaintiff was anxious with no depressive symptoms. (R. at 19.) Plaintiff had mood swings, was restless, awoke in the middle of the night and had increased stress and tension. (R. at 19.)

Dr. Buncher reported that Plaintiff indicated that he was depressed, had help from his neighbor to take care of his home and could no longer fish or camp. (R. at 19.) Plaintiff took

care with his appearance. (R. at 19.) He was diagnosed with dysthymia and assigned a GAF of 65. (R. at 19.) Dr. Buncher's opinions were assigned great weight by the ALJ, because they were consistent with the objective medical evidence. (R. at 19.) The ALJ assessed that Plaintiff's credibility was diminished based on Plaintiff's admitted ADLs, the opinion evidence and objective medical evidence. (R. at 20.) The ALJ also assigned some weight to the non-treating state agency physicians. (R. at 20.)

At step four, the ALJ assessed that Plaintiff did not have the ability to perform his past relevant work. (R. at 20.) Next, considering Plaintiff's age, limited education, ability to communicate in English, work experience and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (R. at 20-21.) The ALJ based his decision on the Grids, because Plaintiff's limitations had little or no effect on the occupational base of unskilled sedentary work. (R. at 21.) The ALJ therefore found that Plaintiff had not been under a disability under the Act from May 11, 2005. (R. at 21.)

Plaintiff asserts that the ALJ was required to obtain the testimony of a VE under the regulations. (Pl.'s Mem. at 7.) Because the ALJ determined that Plaintiff was depressed, he had non-exertional limitations and, therefore, the ALJ could not solely use the Grids to determine whether jobs existed in the national economy that Plaintiff could perform. (*See* Pl.'s Mem. at 7-9.) In contrast, the Commissioner contends that Plaintiff's mental limitations were accounted for with the restriction of simple, unskilled work and that Plaintiff's non-exertional limitations did not affect his ability to perform his occupational base. (Def.'s Mot. for Summ. J. and Brief in Supp. Thereof ("Def.'s Mem.") at 10-15.) Thus, according to the Commissioner, VE testimony was not necessary. (Def.'s Mem. at 10-15.)

Once an ALJ determines a claimant's RFC, he may use the Medical Vocational Guidelines ("Grids") to determine the claimant's level of disability and potential for employment. *Walker*, 889 F.2d at 49. The Grids categorize jobs by their physical-exertion requirements.[9] *See* SSR 83-10. Numbered tables exist for the sedentary, light and medium level (tables 1, 2, and 3, respectively), and a specific rule for the heavy and very heavy levels (Rule 204.00). SSR 83-10; 20 C.F.R. Pt. 404, Subpt. P, App. 2. Based on the claimant's RFC, the ALJ must first determine which table to apply, *i.e.*, if the claimant's RFC limits him to a sedentary exertional level, then Table No. 1 is the appropriate table. Next, based on the claimant's age, education, and previous work experience, the rule directs a finding of "disabled" or "not disabled."

Utilization of the Grids is predicated on the claimant suffering from exertional limitations, and the Grids are not applicable if the claimant suffers solely from non-exertional impairments.[10] 20 C.F.R. § 404.1569a; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 1, □ 200.01(e)(1) ("The rules do not direct factual conclusions of disabled or not disabled for individuals with solely non-exertional types of impairments."). The reason for this rule is that non-exertional limitations may limit a claimant's ability to perform a full range of unskilled occupations at a given exertional level. *See Walker*, 889 F.2d at 49 ("The proper inquiry . . . is whether the nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable.").

---

[9] A claimant's exertional limitation determines the proper exertional level for the claimant's situation. *See* SSR 83-10. An exertional limitation is an impairment-caused limitation which affects one's capability to perform an exertional activity (strength activity) such as sitting, standing, walking, lifting, carrying, pushing and pulling. *Id.*

[10] "Limitations or restrictions which affect [the] ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered non-exertional." 20 C.F.R. § 404.1569a(a).

Thus, where a claimant suffers only exertional limitations, the ALJ must consult the Grids to determine eligibility for benefits. *See id.*; *Cooper v. Sullivan*, 880 F.2d 1152, 1155 (9th Cir. 1989). At the same time, if a claimant suffers from both exertional and non-exertional limitations, then the ALJ must consult the Grids first to determine whether a rule directs a finding of disabled based on the strength requirement alone. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 1, § 200.01(e)(2). If the claimant is found to be disabled on the strength requirement alone (*i.e.*, a claimant is limited to light work and meets the other categories in rule 202.01), then there is no need to examine the effects of the non-exertional limitations. However, if a rule directs a finding of "not disabled" based on the strength requirement (*i.e.*, the claimant is limited to light work and meets one of the categories in rule 202.10), then the ALJ cannot utilize the Grids. Instead, a VE must be utilized to take into account the effects of the claimant's non-exertional and exertional limitations and the claimant's RFC to determine whether there are jobs existing in significant numbers in the national economy that the claimant can perform. *Walker*, 889 F.2d at 49-50.

It is important to note, however, that "not every non-exertional limitation or malady rises to the level of a non-exertional impairment, so as to preclude reliance on the [G]rids." *Walker*, 889 F.2d at 49 (citing *Grant v. Schweiker*, 699 F.2d 189 (4th Cir. 1983)). The ALJ must inquire whether the non-exertional condition affects the claimant's RFC to perform work of which the claimant is exertionally capable. *Id.*

Examples of non-exertional limitations include difficulty: functioning from depression or anxiety; maintaining attention or concentrating; understanding or remembering detailed instructions; seeing or hearing; tolerating physical features of work settings (*e.g.,* dust or fumes); performing manipulative or postural functions. 20 C.F.R. § 404.1569a(c)(1). Dr. Buncher, who

examined Plaintiff and whose opinions the ALJ assigned great weight, (*see* R. at 19), opined that Plaintiff had numerous non-exertional limitations. For example, he noted that Plaintiff's attendance would be impaired from his physical abilities and sad mood and that, as a result of Plaintiff's medication, he had a loss of attention, concentration and focus, which would affect his ability to perform work activities consistently. (R. at 460.) While Plaintiff was "not impaired from completing a normal workweek due to depressed mood," rather due to physical barriers, he had "a very guarded prognosis for dealing with the usual stressors in competitive work." (R. at 460-61.)

The Commissioner asserts that the GAF of 65, which Dr. Boucher assigned to Plaintiff, indicated that Plaintiff could function "pretty well." (Def.'s Mem. at 11.) Continuing, he argues that the ALJ accounted for any non-exertional limitations that Plaintiff might have had by limiting Plaintiff's RFC to simple, unskilled work. (Def.'s Mem. at 11-12.) Unskilled work is defined as:

> work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, [the SSA] consider[s] jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs.

20 C.F.R. § 404.1568(a).

The Commissioner cites to *Wendelin v. Astrue*, 366 F. App'x 899 (10th Cir. 2010), and *Johnson v. Astrue*, No. 3:09-808, 2011 WL 767445 (D.S.C. Jan. 13, 2011), to argue that unskilled work can account for an inability to handle stress in the workplace. (Def.'s Mem. at 12.) However, neither case is applicable here. First, in *Wendelin* the issue was whether a hypothetical posed to the VE that the plaintiff could perform unskilled work fully encompassed

16

Plaintiff's non-exertional limitations. 366 F. App'x at 904. While treating physicians determined that Plaintiff's pain would interfere with her ability to concentrate, Plaintiff had no restrictions with engaging in competitive work. *Id.* Thus, the hypothetical was proper. *Id.* In *Johnson*, the plaintiff appealed on the basis of the ALJ's assessment of the medical opinions and plaintiff's credibility. 2011 WL 767445. Thus, whether an inability to perform competitive work is covered under unskilled work was not before that court.

Regardless, this Court has determined that a VE was not necessary in *Adkins v. Astrue*, 3:10CV60–HEH, 2011 WL 652508, at *3-4 (E.D. Va. Feb. 10, 2011), because the plaintiff's non-exertional limitations did not preclude him from performing the mental activities generally required to perform competitive, remunerative, unskilled work. SSR 96-8p explains that "[w]ork-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." Therefore, if Plaintiff was able to perform the mental activities generally required under SSR 96-8p, a VE was not necessary for the ALJ to determine that Plaintiff was not disabled at step five of the analysis.

In Dr. Buncher's opinion, the effects of Plaintiff's medication resulted in a loss of attention, concentration and focus, which would affect his ability to perform work activities consistently, and Plaintiff had "a very guarded prognosis for dealing with the usual stressors in competitive work." (R. at 460-61.) He also determined that Plaintiff had poor attention, concentration and delayed recall, which would affect his ability to perform work activities consistently. (R. at 458, 460.) Plaintiff would likely accept instructions from a supervisor and could likely interact with co-workers and the general public. (R. at 460.)

Therefore, according to Dr. Buncher, Plaintiff had a limited ability to understand, carry out and remember instructions, which is one of the required skills necessary to perform unskilled work. Additionally, Dr. Buncher's opinion that Plaintiff had "a very guarded prognosis for dealing with the usual stressors in competitive work" could support a decision that Plaintiff's ability to deal with changes in a routine work setting was lacking.

The ALJ noted that Plaintiff was limited to simple, unskilled jobs because of his mental impairments. (R. at 16.) Unfortunately, such a limitation did not fully encompass Dr. Buncher's opinions, which were assigned great weight by the ALJ, as they were consistent with Plaintiff's medical record. (R. at 19.) Because Plaintiff's non-exertional limitations were not included in the ALJ's RFC determination, the ALJ could not rely solely on the Grids. Instead, the ALJ should have heard testimony from a VE, as required by the Fourth Circuit in *Walker*. Thus, this Court recommends that the decision of the Commissioner be VACATED and REMANDED to the ALJ for the sole purpose of obtaining VE testimony.

## VI. CONCLUSION

For the reasons set forth herein, it is the Court's recommendation that Defendant's motion for summary judgment (ECF No. 11) be DENIED; that Plaintiff's motion for summary judgment (ECF No. 8) be GRANTED and that the final decision of the Commissioner be VACATED and REMANDED to the ALJ for the sole purpose of obtaining VE testimony.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable James R. Spencer and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within**

fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

_____ /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated: October 26, 2012